O

# United States District Court
# Central District of California

| | |
|---|---|
| RAPHAEL AUSTRIA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ALORICA, INC. et al.,<br><br>　　　　　Defendants. | Case № 2:20-cv-05019-ODW (PVCx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT EGS'S MOTION TO DISMISS [91]** |

## I.　INTRODUCTION

Plaintiff Raphael Austria asserts four claims against Defendant EGS Financial Care, Inc. ("EGS") arising from EGS's debt collection activities. (Second Am. Compl. ("SAC"), ECF No. 76.) Before the Court is EGS's Motion to Dismiss Austria's SAC. (Mot., ECF No. 91.) For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion.[1]

## II.　FACTUAL BACKGROUND

This case arises from EGS's[2] attempts to collect a debt Austria owed related to his account at Credit One Bank. (SAC ¶ 17.) Credit One Bank and EGS had a vendor

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

[2] Austria first named Alorica, Inc., rather than EGS, as a Defendant. No one currently disputes that EGS is the properly named Defendant.

agreement under which EGS placed collections calls to collect on Credit One Bank's outstanding debts. (*Id.* ¶¶ 18, 36, 45.)

In January 2019, Austria began receiving calls on his cell phone in January 2019 regarding an alleged debt. (SAC − 17.) Over the next seven months, Austria received around 550 calls on his cell phone from 150 different numbers, often multiple times a day. (*Id.* — 20, 34, 35.) The calls persisted despite Austria's multiple attempts to revoke his consent to being contacted by telephone. (*Id.* — 24, 28, 32.) EGS misrepresented or concealed its identity throughout this process. (*Id.* — 41–42.)

Austria asserts four claims against EGS and Defendants iEnergizer Inc., Sutherland Global Services, Inc., and First Contact LLC for (1) violations of the federal Telephone Consumer Protection Act ("TCPA"), (2) violations of the federal Fair Debt Collection Practices Act ("FDCPA"), (3) violations of the California Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), and intrusion upon seclusion. Austria has since dismissed iEnergizer and Sutherland Global Services; First Contact, for its part, answered on July 27, 2021. (ECF No. 88.)

EGS moved to dismiss the SAC for failure to state a claim, and the parties briefed the motion. (Mot.; Opp'n, ECF No. 94; Reply, ECF No. 101.) After the Court took the matter under submission, EGS filed a Notice of Supplemental Authority. (Notice Supp. Authority, ECF No. 107.) Having received and reviewed these materials, the Court rules as follows.

### III.     LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a dismissal motion, a complaint need only satisfy the "minimal notice pleading requirements" of Rule 8(a)(2). *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). Rule 8(a)(2) requires "a short and plain statement of the claim showing that

the pleader is entitled to relief." The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that a claim must be "plausible on its face" to avoid dismissal).

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee*, 250 F.3d at 679. However, a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Ultimately, there must be sufficient factual allegations "to give fair notice and to enable the opposing party to defend itself effectively," and the "allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Where a district court grants a motion to dismiss, it should generally provide leave to amend unless it is clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Leave to amend "is properly denied . . . if amendment would be futile." *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) ("Leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.").

## IV. DISCUSSION

For the following reasons, Austria's allegations preclude the possibility of relief under the TCPA because EGS's system is not an automatic telephone dialing system as defined by the TCPA. By contrast, Austria states plausible entitlement to relief on his federal and state debt collection act claims as well as his intrusion upon seclusion claim.

### A. Telephone Consumer Protection Act claim

EGS moves for dismissal of Austria's TCPA claim on the basis that Austria fails to plausibly allege that EGS used an automatic telephone dialing system ("autodialer") in violation of the TCPA. (Mot. 5–10.) Under the TCPA, it is unlawful "to make any call . . . using any [autodialer] . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). The statute defines an autodialer as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* § 227(a)(1). The parties dispute whether alleging that a system calls a prepopulated list of customers or clients is still sufficient to state a TCPA claim in light of the Supreme Court's recent opinion in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021).

Prior to *Facebook*, district and reviewing courts had reached different conclusions regarding what exactly was modified by the phrase "using a random or sequential number generator." 47 U.S.C. § 227(a)(1)(A). The Seventh Circuit identified four possible interpretations of subdivision (A) of the statute:

(1) to store telephone numbers using a random or sequential number generator, <u>or</u> to produce telephone numbers using a random or sequential number generator;

(2) <u>any</u> storing or producing of telephone numbers to be called, provided that those telephone numbers *were previously generated* using a random or sequential number generator;

4

(3) to store, generally, telephone numbers to be called, <u>or</u> to produce telephone numbers using a random or sequential number generator;

(4) <u>any</u> storing or producing of telephone numbers to be called, provided that those telephone numbers *are later dialed* using a random or sequential number generator.

*Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 464–67 (7th Cir. 2020). The district court had adopted the second interpretation, but the Seventh Circuit overruled it and joined the Eleventh and Third Circuits in adopting the first interpretation, while the Second and Ninth Circuits adopted the third.[3] The grammatical difference between the first and third interpretations was whether the antecedent phrase "using a random or sequential number generator" only modifies "produce" or if it also modifies "store." The practical difference was that under the Ninth Circuit's interpretation a device met the definition of an autodialer as long as it had the capacity to store numbers to be called and dial them automatically, even if it was incapable of using a random or sequential number generator at all. *Facebook*, 141 S. Ct. at 1168.

In addressing this circuit split, the Supreme Court reversed the Ninth Circuit's holding and explicitly held that "a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called." 141 S. Ct. at 1173. This holding effectively strikes interpretation number (3) from the set of four interpretations the Seventh Circuit considered in *Gadelhak*. What the Supreme Court in *Facebook* did not do, however, is indicate exactly which of the other three readings discussed by the Seventh Circuit, if any, is the correct one. This distinction is crucial here because if interpretation (1) or (4) is correct, then Austria states a plausible claim, because it is

---

[3] *See Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020); *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301 (11th Cir. 2020); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1050 (9th Cir. 2018), *abrogated by Facebook*, 141 S. Ct. 1163; *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 281 (2d Cir. 2020), *cert. granted, judgment vacated*, 141 S. Ct. 2509 (2021), *and abrogated by Facebook*, 141 S. Ct. 1163.

plausible that EGS's system either (1) used a random or sequential number generator to store the phone numbers of Austria and others who owed debts to Credit One Bank, or (4) that EGS's systems used a random or sequential number generator to determine which of the phone numbers on the list of putative debtors it would call next.  If, on the other hand, interpretation (2) is correct, then the Court must dismiss the TCPA without leave to amend, because the numbers EGS called were numbers of customers of Credit One Bank, not numbers generated by a random or sequential number generator.

Footnote seven in the *Facebook* opinion speaks to this question without directly deciding or resolving it.  The footnote's purpose is to address concerns that the Court's rejection of the Ninth Circuit's interpretation renders the word "store" in the TCPA definition of an autodialer superfluous.  141 S. Ct. at 1172 n.7.  To allay these concerns, the Supreme Court explained that the word "store" is meant to cover a broader range of autodialing than simply "produce."  *Id.*  The Court provided the example of an autodialer that "use[s] a random number generator to determine the order in which to pick phone numbers from a preproduced list" and "then store[s] those numbers to be dialed at a later time."  *Id.*  At first brush, this note seems to support interpretation (1) or (4), because it describes a situation where the random or sequential number generator is used either to store the numbers in the preproduced list (interpretation (1)) or to later determine the order in which those predetermined numbers would be called (interpretation (4)).

The citation that immediately follows the Supreme Court's example, however, tells a different story.  The citation is to an amicus brief filed by the Professional Association for Customer Engagement.  In the example in the amicus brief, the hypothetical system indeed uses a random number generator to determine the order in which to call numbers on a preproduced list—but that preproduced list was itself a list of phone numbers *generated by a random or sequential number generator*.  *Hufnus v. DoNotPay, Inc.*, No. 20-cv-08701-VC, 2021 WL 2585488, at *1 (N.D. Cal. June 24,

2021). ("That brief makes clear that the 'preproduced list' of phone numbers referenced in the footnote was itself created through a random or sequential number generator."); *In re Portfolio Recovery Assocs., LLC, Tel. Consumer Prot. Act Litig.*, No. 11md02295 JAH - BGS, 2021 WL 5203299, at *3–*4 (S.D. Cal. Nov. 9, 2021) (same); *Timms v. USAA Fed. Saving Bank*, --- F. Supp. 3d ---, 2021 WL 2354931, at *6 (D.S.C. 2021) (same); *Barry v. Ally Financial, Inc.*, No. 20-12378, 2021 WL 2936636, at *6 (E.D. Mich. July 13, 2021) (same). Thus, the citation itself appears to support interpretation (2) and not interpretations (1) and (4).

This Court finds that interpretation (2) is the one that finds most support in the text of the statute, the purpose of the TCPA, and in case law before, after, and including *Facebook*. As the Supreme Court pointed out in *Facebook*, the TCPA was drafted because

> Congress found autodialer technology to be uniquely harmful. It threatened public safety by "seizing the telephone lines of public emergency services, dangerously preventing those lines from being utilized to receive calls from those needing emergency services." H. R. Rep. No. 102–317, p. 24 (1991). Indeed, due to the sequential manner in which they could generate numbers, autodialers could simultaneously tie up all the lines of any business with sequentially numbered phone lines. Nor were individual consumers spared: Autodialers could reach cell phones, pagers, and unlisted numbers, inconveniencing consumers and imposing unwanted fees.

141 S. Ct. at 1167. The Court also noted that at the time "most cellular providers charged users not only for outgoing calls but also for incoming calls." *Id.* at 1167 n.1.

None of these concerns are present in a case where the phone numbers being dialed come from a legitimate list of customer or client contacts rather than the workings of a random or sequential number generator. Austria alleges EGS is calling him as an alleged debtor of Credit One Bank. While it is plausible that EGS is calling other potential debtors of Credit One Bank, it is not plausible that EGS is calling other numbers at random or sequentially. Austria's allegations therefore present no concern

that EGS's system will seize up the telephone lines of public emergency services, tie up the lines of businesses with sequentially numbered phone lines, or cause inconvenience or expense to owners of individual cell or home phone numbers who have nothing to do with Credit One Bank. *Facebook*, 141 S. Ct. at 1167.

Interpretation (2) also comports with the plain language of the statute at least as well as any other interpretation. In reviewing other courts' detailed attempts to harmonize the disjunctive nature of "store or produce" with the ambiguous placement of the comma and antecedent phrase, this court must bear in mind that at "a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993). This is especially true here, where, as the Seventh Circuit has noted, the comma at issue is "ungrammatical under any interpretation." *Gadelhak*, 950 F.3 at 468; *see also Facebook*, 141 S. Ct. at 1173–75 (Alito, J., concurring) (concurring in judgment but cautioning against "heavy reliance" on canons of statutory interpretation). In this case, the interpretive difficulties of the TCPA's definition of an autodialer are lessened when the phrase "store or produce" is viewed less as two strictly disjunctive prongs and more as a three-word phrase that represents a single, unified concept. This deprioritizes the need to focus on which of the two verbs the antecedent phrase modifies and it prioritizes a more natural reading of the text based on Congress' intentions.

To illustrate this observation, the word "prepare" can be used in the statute as a stand-in for the phrase "store or produce"—not to replace Congress' words, but to demonstrate how the interpretive problems are solved when the phrase is viewed as a single concept. Thus, for the sake of illustration, the statute would read "prepare numbers to be called, using a random or sequential number generator."

First, in this iteration, the reasons for the comma and its placement are clear and unambiguous: the comma's purpose is to separate "called" from "using" in order to indicate that Congress meant "prepare numbers using a random or sequential number

generator and then later call them," not "prepare numbers, which will later be called using a random or sequential number generator."[4]

Viewing "store or produce" as a single concept also addresses the Seventh Circuit's concern that interpretation (2) requires courts to add a word that is not there. *Gadelhak*, 950 F.3d at 465–66. Rather than modifying "telephone numbers," the antecedent phrase modifies the singular concept of "store or produce," with no need to add a word for the sake of grammar. Interpretation (2) is also fully consistent with *Facebook* itself, and it is as consistent as practically possible with *Facebook* footnote seven, because it both acknowledges that "store or produce" was meant to cover all the ways that a phone number might be generated using a random or sequential number generator while avoiding rendering "store" superfluous.

Interpretations (1) and (4), on the other hand, lead to absurdities. Under interpretation (1), the prohibited action is storing a phone number using a random or sequential number generator. This definition is broad, vague, and unworkable. To illustrate, suppose Company A has a list of customer phone numbers that it places into spreadsheet software (such as Excel) as individual line items. In most spreadsheet programs, the sheet lines are numbered, and a band on the left side of the screen provides a sequential list of numbers, such that in Company A's spreadsheet, each customer phone number corresponds to a sequential line number. Company A saves the Excel chart onto its hard drive. Technically speaking, the company has stored its pre-existing phone numbers by making use of a sequential number-generating feature in Excel, thus satisfying the first prong of the TPCA. If Company A later uses that Excel chart to call its customers, it has technically violated the TCPA. That this is a TCPA violation is illogical, not only because these actions are far afield from Congress' stated concerns in passing the TCPA, but also because one is left wondering exactly what Company A did wrong in this hypothetical.

---

[4] This second reading is likely foreclosed by *Facebook* in any case.

By contrast, suppose Company B does the same thing, except it saves its customer phone numbers to a word processing document, which does not generate a sequential list of numbers to accompany the customer phone numbers. Company B can call the customers on that list without incurring TCPA liability. Yet, there is no logical or legal reason why Company A should incur TCPA liability but Company B should not. These fine distinctions have nothing to do with any of the reasons Congress passed the TCPA, and the fact that Austria's proffered interpretation leads the Court into this territory is strong evidence that Austria's interpretation is far afield from Congress' intentions.

Similar problems arise with interpretation (4). Moreover, interpretation (4) appears to be most at odds with the comma. If Congress had intended interpretation (4), then excluding the comma would have made it much clearer that what was meant was "dialed using a random or sequential number generator," not "stored or produced using a random number generator." And in any case, although the *Facebook* Court was not directly analyzing whether interpretation (4) was proper, its holding that "using a random or sequential number generator" applies to both "store and produce" seems to preclude any reasonable argument that "using a random or sequential number generator" somehow also or alternatively applies to "dialed." 141 S. Ct. at 1173.

Accordingly, this Court concludes that interpretation (2) is proper, which requires dismissal of Austria's TCPA claim. This conclusion is in accord with district courts in the Ninth Circuit who, following *Facebook*, have dismissed very similar TCPA claims at the pleading stage. One district court in the Ninth Circuit found that a platform was not an autodialer because "the platform only contacts phone numbers specifically provided by consumers during [the defendant's] registration process, and not phone numbers identified in a random or sequential fashion." *Hufnus*, 2021 WL 2585488, at *1. Another court found the same, noting that the "preproduced list" in *Facebook* footnote 7 "is one that is 'sequentially generated and stored'" and requiring the same of a TCPA defendant's system. *Barry*, 2021 WL 2936636, at *6; *see also In*

*re Portfolio Recovery Assocs.*, 2021 WL 5203299, at *4; *Timms*, 2021 WL 2354391, at *7. This Court joins these courts in finding that a system that selects phone numbers from a prepopulated list does not constitute an autodialer where the prepopulated list was not itself generated using a random or sequential number generator, even if the phone number selection process itself involves a random or sequential number generator. Here, Austria alleges at most that EGS used a random or sequential number generator in selecting or dialing his number from a prepopulated list; he does not allege that his name was on that prepopulated list due to the work of a random or sequential number generator.

For these reasons, the Court **GRANTS** EGS's Motion to Dismiss Plaintiff's claim for violations of the TCPA. As Plaintiff's claim is fundamentally grounded on the allegations that EGS, a debt collector, obtained Austria's number from Credit One Bank and not by using a random or sequential number generator, any further amendment of this claim would be futile. Dismissal is therefore **WITHOUT LEAVE TO AMEND**. *Carrico*, 656 F.3d at 1008.

B.  **Federal and state debt collection act (FDCPA and Rosenthal Act) claims**

EGS also moves to dismiss Austria's FDCPA and Rosenthal Act claims, asserting that the SAC fails to allege that EGS regularly engages in debt collection or that its principal purpose is debt collection. (Mot. 10–11.) The FDCPA applies to "debt collectors," which it defines as either (1) "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts" (the "principal purpose" definition), or (2) any person "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another" (the "regularly collects" definition). *McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089, 1093 (9th Cir. 2020) (citing 15 U.S.C. § 1692a(6)), *cert. denied sub nom. DNF Assocs., LLC v. McAdory*, 141 S. Ct. 627 (2020). "The FDCPA uses the phrase 'principal purpose' to refer to a business's most important goal or objective," and debt collection is not a business's

principal purpose if debt collection is merely incidental to the business's objectives. *Id.* The "regularly collects" prong, on the other hand, concerns whether debt collection is among the business's regular activities. *Id.*

The Rosenthal Act's definition of a "debt collector" is broader and more inclusive than the FDCPA's, *Robinson v. Managed Accts. Receivables Corp.*, 654 F. Supp. 2d 1051, 1060 n.8 (C.D. Cal. 2009), and includes "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection," Cal. Civ. Code § 1788.2(c).

First, Austria sufficiently alleges that EGS is a debt collector under the FDCPA "principal purpose" definition. The question is simply whether it is plausible that debt collection is EGS's "dominant, or principal, objective." *McAdory*, 952 F.3d at 1093. The answer is yes: Austria alleges that EGS had a business relationship with Credit One Bank under which Credit One compensated EGS for collecting debts. Austria also alleges that EGS used a complex automated telephone system to collect those debts and that EGS, in its calls, expressly represented that they were calling to collect that debt. Moreover, in contacting Austria, EGS obscured the difference between EGS and Credit One, the entity to whom Austria purportedly owed debt. Under these facts, it is plausible that EGS's principal purpose was debt collection.

Austria also sufficiently alleges that EGS is a debt collector under the FDCPA "regularly collects" definition. As alleged, EGS had a vendor agreement with Credit One Bank, and was hired by Credit One to make collection calls on behalf of Credit One. Over the course of several months, Austria received hundred of calls on his cell phone from EGS representatives stating their intent to collect an alleged debt related to his account at Credit One Bank. Under these facts, it is plausible that EGS makes similar attempts with other debtors and therefore regularly collects debts.

The Rosenthal Act's definition of debt collector is broader than the FDCPA's. *Robinson*, 654 F. Supp. 2d at 1060 n.8. As Austria's allegations regarding EGS's

status as a debt collector are sufficient under the FDCPA, they are sufficient under the Rosenthal Act as well.

For these reasons, the Court **DENIES** EGS's motion as to Plaintiff's claims under the FDCPA and Rosenthal Act.

## C. Intrusion upon seclusion claim

Finally, EGS moves to dismiss Austria's claim is for intrusion upon seclusion. (Mot. 11–12.) Under California common law, intrusion upon seclusion is actionable "if the intrusion would be highly offensive to a reasonable person." *Deteresa v. Am. Broad. Cos.*, 121 F.3d 460, 465 (9th Cir. 1997). Courts have repeatedly found that "unwanted calls, received at inconvenient times, generally invade an individual's privacy and right to be let alone." *Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 802 (9th Cir. 2017) (citing Restatement (Second) of Torts § 652B (1977)). "To state a claim for intrusion upon seclusion under California common law, a plaintiff must plead that (1) a defendant intentionally intruded into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy, and (2) the intrusion occurred in a manner highly offensive to a reasonable person." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) (cleaned up), *cert. denied sub nom. Facebook, Inc. v. Davis*, 141 S. Ct. 1684 (2021). EGS moves to dismiss this claim on the grounds that Austria does not sufficiently allege (1) that EGS intended to intrude, (2) that EGS violated any reasonable expectation of privacy, or (3) that EGS's conduct was highly offensive under California law. EGS is incorrect on each point.

EGS first argues that the SAC's allegations regarding its own intent are deficient because Austria "fails to allege that EGS had actual knowledge of any desire not to be contacted by phone regarding his Credit One Bank Account." (Mot. 11–12.) EGS's argument rests on the assumption that its alleged intrusions into Austria's privacy cannot be intentional unless and until EGS had actual knowledge that Austria had revoked consent to have his privacy invaded in that way. EGS provides no

authority for this assumption, and in any case, it appears contrary to California law. *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 232 (1998) (noting that merely violating a zone of physical or sensory privacy around the plaintiff constitutes actionable intrusion).

EGS then argues that Austria fails to allege he had "a reasonable expectation that he would not be contacted by Defendant" because the calls were related to his Credit One account, meaning Austria should have expected that he might be contacted in connection with that account. (Mot. 12.) This assertion is contrary to case law because "[r]epeated and continuous phone calls in an attempt to collect a debt give rise to a claim for intrusion upon seclusion." *Inzerillo v. Green Tree Servicing LLC*, No. 13-cv-06010-MEJ, 2014 WL 1347175, at *4 (N.D. Cal. Apr. 3, 2014). Austria plausibly claims a reasonable expectation in the privacy interest that EGS invaded when it repeatedly called him over the course of several months.

Finally, EGS argues that Austria fails to allege EGS's conduct was highly offensive to a reasonable person because EGS was simply making phone calls related to an account that Plaintiff opened. (Mot. 12.) EGS's argument, however, fails to address the allegations in the SAC regarding the invasive nature of the timing, volume, and frequency of the phone calls. The mere fact that an individual may owe a debt does not mean that individual has revoked his common law right to be free of offensive intrusions upon his seclusion. Austria sufficiently alleges that EGS engaged in highly offensive conduct for the purpose of this claim.

The Court therefore **DENIES** EGS's Motion to Dismiss as to Austria's claim for intrusion upon seclusion.

///
///
///
///
///

## V.   CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** EGS's Motion to Dismiss Plaintiff's Second Amended Complaint.  (ECF No. 91.)  Plaintiff's first claim for violation of the Telephone Consumer Protection Act is **DISMISSED WITH PREJUDICE** and **WITHOUT LEAVE TO AMEND**.  EGS's motion is otherwise denied.  EGS shall answer within **twenty-one (21)** days.

**IT IS SO ORDERED.**

December 16, 2021

_____
OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE